# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| CARLA J. SHOWMAN, | ) | CASE NO. 1:17CV02017 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Carla J. Showman, ("Plaintiff" or "Showman"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social

Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction

pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate

Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and

Recommendation.  For the reasons set forth below, the Magistrate Judge recommends the

Commissioner's final decision be VACATED and the case REMANDED for further proceedings

consistent with this decision.

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

1

# I.    PROCEDURAL HISTORY

In May 2014, Showman filed an application for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and SSI, alleging a disability onset date of January 1, 2012[2] and claiming she was disabled due to bipolar disorder, panic disorder, attention deficit disorder, osteoarthritis, rheumatoid arthritis, degenerative disc disease, and diabetes.  (Transcript ("Tr.") 265, 272, 311.)  The applications were denied initially and upon reconsideration, and Showman requested a hearing before an administrative law judge ("ALJ").  (Tr. 209, 219, 226.)

On April 15, 2016, an ALJ held a hearing, during which Showman, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 46-115.)  On May 26, 2016, the ALJ issued a written decision finding Showman was not disabled.  (Tr. 21-45.)  The ALJ's decision became final on July 24, 2017, when the Appeals Council declined further review.  (Tr. 1.)

On September 25, 2017, Showman filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 14, 15, 16.)  Showman asserts the following assignment of error:

> (1) Whether the the[sic] ALJ properly considered the findings of the prior ALJ as required by *Drummond v. Commissioner of Social Security, Dennard v. Secretary of Health & Human Services*, and Acquiescence Ruling 98-4(6).

(Doc. No. 14.)

---

[2]    Showman later amended her alleged onset date to August 1, 2013.  (Tr. 306.)  As her date last insured ("DLI") for POD and DIB benefits was June 30, 2013, Showman willingly relinquished her claim to these benefits.  (Tr. 24, 26, 50, 306.)  Showman does not contest this amendment, and in her Brief, continues to allege a disability onset date of August 1, 2013.  (Doc. No. 14 at 2.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Showman was born in May 1961 and was 54 years-old at the time of her administrative hearing, making her a "person closely approaching advanced age" under social security regulations.  (Tr. 35.)  *See* 20 C.F.R. §§ 404.1563(d) & 416.963(d).  She has a high school education and is able to communicate in English.  (*Id.*)  She has past relevant work as a short order cook and sales clerk.  (Tr. 34.)

### B.    Medical Evidence[3]

On January 19, 2011, Showman visited psychiatrist Dennis Ugboma, M.D.  (Tr. 1435.) While the bulk of this treatment note is not legible, Dr. Uboma conducted a mental status examination, which was within normal limits.  (*Id.*)  Showman returned to Dr. Ugboma on February 24, 2011.  (Tr. 1433.)  Similarly, her mental status examination was normal, but the remainder of the treatment note was not legible.  (*Id.*)  Dr. Ugboma characterized Showman as "moderately ill," prescribed medications, and advised her to return in two months.  (Tr. 1434.)

On January 17, 2012, Showman presented to the emergency room with back pain.  (Tr. 390.)  The emergency room physicians administered a Toradol intramuscular injection and provided pain medications.  (Tr. 392, 393.)  Showman's condition improved and she was discharged.  (Tr. 394.)

---

[3]    The Court notes Showman does not specifically cite to any medical evidence in her brief, asserting "the legal error committed by the ALJ is entirely procedural." (Doc. No. 14 at 4.)  Regardless, the Commissioner does cite to medical evidence in her brief.  (*See* Doc. No. 15 at 2, 3.)  Thus, the Court will provide a discussion of the evidence identified by the Commissioner.  This discussion is not exhaustive and reviews only those treatment notes referenced by the Commissioner.

Showman visited psychiatric nurse Barbara Wiseley-Cortland, MSN at Beacon Health on April 6, 2012.  She reported everything was "going well."  (Tr. 1423.)  Showman returned to Ms. Wisely-Cortland on May 25, 2012, reporting she had quit her job because her manager was abusive.  (Tr. 1421.)  She characterized her medications as "wonderful" and her memory, behavior, cognition, insight, and judgment were all within normal limits.  (*Id*.)  On July 6, 2012, Showman reported she was doing "OK" and her memory was within normal limits.  (Tr. 1419.)

On August 16, 2012, Showman reported to Ms. Wisely-Cortland she had recently started working at a pizza shop.  (Tr. 1417.)  She denied suicidal ideation and her memory was within normal limits.  (*Id*.)  On October 16, 2012, Showman indicated work was going well and her mood was stable.  (Tr. 1415.)

Showman continued to treat with Ms. Wisely-Cortland in 2013.  On January 29, 2013, Showman reported she recently moved due to issues with her landlord.  (Tr. 1413.)  She declined counseling at that time.  (*Id*.)  On February 26, 2013, Showman indicated she felt stable, but her Lexapro caused lightheadedness.  (Tr. 1411.)  On May 7, 2013, Showman described some stressors and low energy, but her mental status examination was within normal limits.  (Tr. 1407.)  Ms. Wisely-Cortland characterized Showman as "moderately ill."  (Tr. 1408.)

On June 24, 2013, Showman visited the emergency room for left-sided neck and shoulder pain.  (Tr. 555.)  She received Vicodin and a Toradol injection and was discharged in improved condition.  (Tr. 558, 559.)  She returned to the emergency room on August 8, 2013, reporting left shoulder pain.  (Tr. 575.)  She was provided with Toradol and her condition improved.  (Tr. 578.)

Showman visited the emergency room again on August 15, 2013 with left-sided upper back pain.  (Tr. 597.)  She was provided with Toradol and discharged in improved condition.

4

(Tr. 601.)  She returned to the emergency room on August 27, 2013 with left shoulder pain.  (Tr. 634.)  Her received Vicodin and Toradol and improved.  (Tr. 639.)

Showman returned to Ms. Wisely-Cortland on August 27, 2013, indicating increased physical problems.  (Tr. 860.)  Her thought process, thought content, and her appearance were all within normal limits.  (*Id*.)

On December 5, 2013, Ms. Wisely-Cortland noted Showman had a normal thought process, no suicidal ideation, but was anxious.  (Tr. 858.)  On January 30, 2014, Showman reported to Ms. Wisely-Cortland she was quitting her job.  (*Id*.)  On April 28, 2014, Showman reported distress over living in a homeless shelter.  (Tr. 1399.)

On May 3, 2014, Showman saw Marie Miller, a case manager at Beacon Health.  (Tr. 1036.)  She reported low motivation and requested help filling out paperwork.  (*Id*.)  Showman presented as depressed and was crying during the visit.  (*Id*.)  Showman returned to Ms. Miller on May 5, 2014 and discussed her housing issues and relationship problems.  (Tr. 1459.)

Showman visited Ms. Wisely-Cortland on May 19, 2014.  (Tr. 1397.)  She appeared stressed and indicated she recently was diagnosed with fibromyalgia.  (*Id.*)  On June 5, 2014, Showman saw counselor Cheryl Wilson at Beacon Health and requested counseling in order to address boundary issues and her relationship with her daughter.  (Tr. 1042.)

On June 6, 2014, Showman visited the emergency room for general weakness, a cough, rib pain, and right kidney pain.  (Tr. 797.)  She returned to the emergency room on June 10, 2014 for bilateral hip pain.  (Tr. 837.)  She was provided Motrin and Percocet and discharged in improved condition.  (Tr. 839, 840.)

Showman saw Ms. Wisely-Cortland on June 18, 2014, reporting poor sleep, depression,

5

and a recent diagnosis of rheumatoid arthritis.  (Tr. 850.)  Ms. Wisely-Cortland characterized

Showman as "moderately ill."  (Tr. 851.)  Showman saw case manager, Marie Miller, on June 27,

2014.  She presented as depressed and irritable.  (Tr. 1034.)  Showman continued to visit Ms.

Miller on a regular basis in an effort to obtain secure housing.  (Tr. 1028, 1030.)

Showman was homeless throughout August 2014 and was sleeping on porches and in

garages.  (Tr. 1026.)  Ms. Miller noted Showman was depressed and irritable.  (*Id*.)  On August

14, 2014, Showman presented as frustrated and raised her voice at times.  (Tr. 1038.)  On August

19, 2014, she was depressed, angry, and tearful.  (Tr. 1018.)  At that point, Ms. Wisely-Cortland

characterized Showman as "markedly ill" and prescribed Cymbalta.  (Tr. 1019.)

On October 22, 2014, Showman underwent a psychiatric evaluation[4] at Beacon Health.

(Tr. 1182.)  She described a history of childhood abuse, multiple psychiatric hospitalizations, and

three prior suicide attempts.  (Tr. 1182, 1183.)  She reported chronic suicidal ideation, but cited

her grandson as a reason to live.  (Tr. 1184.)  Her diagnoses were bipolar disorder and PTSD,

with a global assessment of functioning ("GAF") score[5] of 50.  (*Id*.)

Showman followed up with Ms. Wisely-Cortland on November 20, 2014, reporting she

had moved in with a friend.  (Tr. 1389.)  She was less stressed and her mood had improved.  (*Id*.)

---

[4]     The signature of the evaluator is not legible.

[5]     The GAF scale reports a clinician's assessment of an individual's overall level
of functioning.  An individual's GAF is rated between 0-100, with lower numbers
indicating more severe mental impairments.  A GAF score between 41 and 50 indicates
serious symptoms or any serious impairment in social, occupational or school
functioning.  A recent update of the DSM eliminated the GAF scale because of "its
conceptual lack of clarity . . . and questionable psychometrics in routine practice."  *See
Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American
Psychiatric Ass'n, 5th ed., 2013).

Ms. Wisely-Cortland determined Showman was still "markedly ill." (Tr. 1390.) On December 30, 2014, Showman described low energy and being "tired of life." (Tr. 1387.)

On February 12, 2015, Showman reported her mood was impacted negatively by chronic pain. (Tr. 1385.) Ms. Wisely-Cortland adjusted Showman's medications and assigned her a GAF score of 55. (Tr. 1386.) On March 12, 2015, Showman was having increasing ruminations, mood swings, and auditory and visual hallucinations. (Tr. 1383.) She began to take an antipsychotic medication and her GAF score was lowered to 50. (Tr. 1383, 1384.)

Showman reported improvement in her mood on April 17, 2015. (Tr. 1641.) However, during her medication management session, she was talking excessively, with racing thoughts. (*Id.*) She refused to take any medication for her bipolar disorder. (Tr. 1642.)

On May 20, 2015, Showman visited the emergency room for increased depression. (Tr. 1600.) She reported a recent change to her medications, which had increased her mental health symptoms. (*Id.*) She denied suicidal ideation, but indicated she had felt like "what is the point in living" a week prior. (*Id.*) The emergency room physicians advised her to follow up at Beacon Health, as she did not meet the criteria for inpatient hospitalization. (*Id.*)

**C.     State Agency Reports**

**1.        Mental Impairments**

On August 14, 2014, state agency physician Vicki Warren, Ph.D., reviewed Showman's medical records and completed a Psychiatric Review Technique ("PRT"). (Tr. 148-149.) She concluded Showman had (1) mild restrictions in activities of daily living; (2) mild difficulties in maintaining social functioning; (3) mild difficulties in maintaining concentration, persistence, and pace; and (4) no episodes of decompensation. (Tr. 149.) Dr. Warren concluded Showman's

7

"overall condition is not severe."  (*Id.*)

On February 3, 2015, state agency physician Leslie Rudy, Ph.D., reviewed Showman's medical records and completed a PRT and Mental Residual Functional Capacity ("RFC") Assessment.  (Tr. 181-182, 186-187.)  She concluded Showman had (1) mild restrictions in activities of daily living; (2) mild difficulties in maintaining social functioning; (3) moderate difficulties in maintaining concentration, persistence, and pace; and (4) no episodes of decompensation.  (Tr. 182.)  With regard to Showman's mental functional limitations, Dr. Rudy found Showman was moderately limited in her ability to respond appropriately to changes in the work setting.  (Tr. 186.)  She found Showman was not significantly limited in her abilities to (1) have sustained concentration and persistence; (2) socially interact; and (3) set realistic goals or make plans independently of others.  (*Id.*)  Dr. Rudy found no evidence of any limitation in Showman's abilities to (1) understand and remember; (2) be aware of normal hazards and take appropriate precautions; and (3) travel in unfamiliar places or use public transportation.  (*Id.*)  Dr. Rudy explained the basis of her decision as follows:

> [Claimant's mental status examination] mostly [within normal limits], however, she is noted to have some [suicidal ideation] and frustration/depression which will impact ability to adapt.

(*Id.*)

## 2.      Physical Impairments

On August 15, 2014, state agency physician Diane Manos, M.D., reviewed Showman's medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment. (Tr. 150-151.)  Dr. Manos determined Showman could lift and carry 50 pounds occasionally and 25 pounds frequently; stand and/or walk for about 6 hours in an 8-hour workday; and sit for

about 6 hours in an 8-hour workday.  (Tr. 150.)  She further found Showman could occasionally

climb ramps and stairs, never climb ladders, ropes, or scaffolds, and occasionally balance, stoop,

kneel, crouch, and crawl.  (Tr. 151.)

On February 3, 2015, state agency physician Dimitri Teague, M.D., reviewed Showman's

medical records and completed a Physical RFC Assessment.  (Tr. 183-185.)  Dr. Teague

determined Showman could lift and carry 20 pounds occasionally and 10 pounds frequently;

stand and/or walk for about 6 hours in an 8-hour workday; and sit for about 6 hours in an 8-hour

workday.  (Tr. 183.)  He further found Showman could occasionally climb ramps and stairs,

never climb ladders, ropes, or scaffolds, and occasionally balance, stoop, kneel, crouch, and

crawl.  (Tr. 184.)  Dr. Teague opined Showman could frequently handle bilaterally.  (*Id.*)  He

found she would need to avoid concentrated exposure to extreme cold and heat and all exposure

to unprotected heights and hazards.  (Tr. 185.)

**D.     Hearing Testimony**

During the April 15, 2016 hearing, Showman testified to the following:

- She graduated high school.  (Tr. 56.)  She attempted college in 2012, but stopped due to pain.  (*Id.*)  She is able to read, but has poor concentration.  (Tr. 57.)

- She briefly worked in 2013 at a pizza shop.  (Tr. 59.)  She also worked at a medical uniform shop, fast food restaurants, and as a bartender.  (Tr. 62-64.) She had difficulty working anywhere for more than a few months because of memory problems and low stress tolerance.  (Tr. 73, 74.)

- She cannot work due to "overwhelming pain pretty much everywhere in the joints."  (Tr. 75.)  Rheumatoid arthritis "destroyed" her hands and she had weakness in her legs and hips.  (Tr. 75-76.)  She also has diabetic neuropathy in her feet.  (Tr. 77.)  She has been intermittently ambulating with a cane since August 2014 and has had multiple falls.  (Tr. 94-96.)

- She underwent carpal tunnel procedures on both hands.  (Tr. 79.)  She continues to have hand pain due to arthritis.  (*Id.*)  She has poor grasp in both hands and

struggles to pick up small objects.  (Tr. 80.)

- She has vascular problems in her legs and has undergone surgery for such.  (Tr. 81.)  Her legs have "never been the same" since this procedure and are always weak.  (Tr. 81-82.)

- She also has mental conditions, for which she takes medication.  (Tr. 82.)  She does not socialize and often requires someone to be with her when she goes into public.  (Tr. 83.)  She does not have many friends. (Tr. 85.)   She has crying spells.  (Tr. 100.)

The VE testified Showman had past work as a cook, short order (D.O.T. #313.374-014); sales clerk (D.O.T. #290.477-014); and fast foods worker (D.O.T. #311.472-010).  (Tr. 105-106.)

The ALJ posed the following hypothetical question:

> For the first hypothetical, if you could please assume an individual claimant's age, education and work experience.  You can also assume that this individual can perform the full range of light[6] work.  Occasionally climb ramps and stairs.  Never climb ladders, ropes and scaffolds.  Occasionally balance, stoop, kneel, crouch and crawl.  Have frequent bilateral handling. Frequent exposure to extreme cold and extreme heat.  Never be exposed to hazards and is limited to routine work place changes that can be explained.

(Tr. 106-107.)

The VE testified the hypothetical individual would be able to perform Showman's past work as short order cook and sales clerk.  (Tr. 107.)  The VE further explained the hypothetical

---

[6]     "Light work" is defined as follows: "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 CFR § 404.1567(b). Social Security Ruling 83–10 clarifies that "since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off or on, for a total of approximately six hours of an 8–hour workday." SSR 83–10, 1983 WL 31251 (1983).

individual would also be able to perform other representative jobs in the economy, such as cleaner, housekeeper (D.O.T. #323.687-014); sales attendant (D.O.T. #299.677-010); and mail clerk (D.O.T. #209.687-026).  (Tr. 108.)

### III.    STANDARD FOR DISABILITY

A disabled claimant may be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience.  *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past

11

relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through June 30, 2013.

2.    The claimant has not engaged in substantial gainful activity since August 1, 2013, the amended alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.    The claimant has the following severe impairments: spine disorders, dysfunction of major joints, peripheral vascular (arterial) disease, diabetes with neuropathy, and affective disorders (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant is limited to occasional climbing of ramps and stairs; no climbing of ladders, ropes, and scaffolds; occasional balancing, stooping, kneeling, crouching, and crawling; frequent bilateral handling; frequent exposure to extreme cold and extreme heat; and no exposure to hazards. The claimant is limited to routine workplace changes that can be explained.

6.    The claimant is capable of performing past relevant work as a Short Order Cook and a Sales Clerk. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1564 and 416.965).

7.    The claimant has not been under a disability, as defined in the Social Security

Act, from August 1, 2013, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 26-36.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion,

13

the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

# VI.  ANALYSIS

**A.**     *Drummond/Dennard*

Showman argues the "ALJ failed to properly consider the findings of a prior ALJ as required by the Commissioner's rules and regulations."  (Doc. No. 14 at 1.)  Showman asserts the ALJ assessed an RFC which was "less restrictive than that of [the prior] ALJ."  (*Id.* at 6.)  She contends the ALJ was "bound by [the prior ALJ RFC findings] unless there was new and material evidence to the contrary."  (*Id.*)  Showman maintains "it is impossible for a reviewing court to determine just what the ALJ was thinking given the fact the decisions is devoid of any analysis on the effect of *res judicata*."  (Doc. No. 16 at 1.)

The Commissioner acknowledges she carries "the burden of proving changed circumstances since the prior ALJ decision."  (Doc. No. 15 at 5.)  However, she asserts the "error is harmless under the facts of the case, and remand to consider the 2005 ALJ decision is unwarranted."  (*Id.*)  The Commissioner argues this error is harmless because (1) there is an 11-year gap between the ALJ decisions; (2) the physical portion of the RFC in the more recent ALJ decision "is more claimant-favorable;" (3) when assessing the less restrictive mental RFC, "the ALJ so clearly relied on new and material evidence;" and (4) the "new and material evidence thus plainly permitted the ALJ to escape the principles of *res judicata* and diverge from the 2005 decision."  (*Id.* at 5-9.)  Finally, the Commissioner contends the error is harmless as "the jobs identified in the 2016 decision do not require the additional capacity entailed in that decision's less restrictive mental RFC."  (*Id.* at 10.)

In *Drummond v. Commissioner of Social Security*, the Sixth Circuit held that "[w]hen the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the

Commissioner is bound by this determination absent changed circumstances." *Drummond*, 126 F.3d 837, 842 (6th Cir. 1997)(relying on *Senters v. Sec'y of Health & Human Servs*., 1992 WL 78102 (6th Cir. Apr. 17, 1991) (per curiam).  *See also Dennard v. Sec'y of Health & Human Servs*., 907 F.2d 598 (6th Cir.1990) (per curiam); *Blankenship v. Comm'r of Soc. Sec.*, 624 Fed. Appx. 419, 425 (6th Cir. Aug. 26, 2015).  In that case, Drummond's initial claim for SSI was denied when an ALJ found that Drummond retained a RFC for sedentary work.  *Drummond*, 126 F.3d. at 838.  When Drummond later re-filed her disability claim, a second ALJ found that Drummond retained a RFC suitable for medium-level work—unlike the sedentary RFC finding of the first ALJ—and denied the re-filed claim.  *Id*. at 839.  After explaining that "*[r]es judicata* applies in an administrative law context following a trial type hearing," the Sixth Circuit held that the second ALJ was bound to the sedentary RFC determination of the first ALJ because there was no new or additional evidence of an improvement in Drummond's condition.  *Id*. at 841–842. "Just as a social security claimant is barred from relitigating an issue that has been previously determined, so is the Commissioner."  *Id*.

In response to *Drummond*, the Social Security Administration promulgated Acquiescence Ruling 98–4(6). The Administration explained:

> This Ruling applies only to disability findings in cases involving claimants who reside in Kentucky, Michigan, Ohio, or Tennessee at the time of the determination or decision on the subsequent claim at the initial, reconsideration, ALJ hearing or Appeals Council level.  It applies only to a finding of a claimant's residual functional capacity or other finding required at a step in the sequential evaluation process for determining disability provided under 20 CFR 404.1520, 416.920 or 416.924, as appropriate, which was made in a final decision by an ALJ or the Appeals Council on a prior disability claim.
>
> **When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals**

16

> **Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding** or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding.

AR 98–4(6) (S.S.A.), 1998 WL 283902, at *3 (1998) (emphasis added) (footnote omitted).

Subsequent to Showman's appeal to this Court becoming ripe, the Sixth Circuit clarified the scope of *Drummond* and its progeny in *Earley v. Comm'r of Soc. Sec.*, 893 F.3d 929 (6th Cir. June 27, 2018). In *Earley*, the Sixth Circuit clarified *res judicata* applies to subsequent applications for "the same period of time [] rejected by the first application." *Id.* at 933. The Sixth Circuit further reasoned

> While we are at it, we should point out that issue preclusion, sometimes called collateral estoppel, rarely would apply in this setting. That doctrine "foreclos[es] successive litigation of an issue of fact or law actually litigated and resolved." *Id.* at 748-49, 121 S.Ct. 1808. But human health is rarely static. Sure as we're born, we age. Sometimes we become sick and sometimes we become better as time passes. Any earlier proceeding that found or rejected the onset of a disability could rarely, if ever, have "actually litigated and resolved" whether a person was disabled at some later date.
>
> All of this helps to explain why *Drummond* referred to "principles of *res judicata*" – with an accent on the word "principles." 126 F.3d at 841-843. What are those principles? Finality, efficiency, and the consistent treatment of like cases. An administrative law judge honors those principles by considering what an earlier judge found with respect to a later application and by considering that earlier record. *Id.* at 842, *see Albright v. Comm'r of Soc. Sec.*, 174 F.3d 473, 478 (4th Cir. 1999). This is why it is fair for an administrative law judge to take the view that, absent new and additional evidence, the first administrative law judge's findings are legitimate, albeit not binding, consideration in reviewing a second application.

*Earley*, 893 F.3d at 933.

Here, Showman filed an earlier application for POD, DIB, and SSI in November 2002,

17

alleging disability since February 2001.  (Tr. 133.)  In a written decision dated May 3, 2005,[7] an

ALJ considered the medical evidence regarding Showman's physical and mental impairments.

(Tr. 134-135.)  Based upon this evidence, the ALJ determined Showman had the severe

impairments of bipolar disorder, PTSD, borderline personality disorder, a history of

polysubstance abuse, a history of bilateral carpal tunnel syndrome, and cervical spondylosis.  (Tr.

137.)  After concluding Showman did not meet or equal any Listing, the ALJ assessed the

following RFC:

> The claimant has the residual functional capacity to perform work-related
> activities limited to work involving occasionally lifting, carrying, pushing
> or pulling objects weighing no more than 20 pounds; frequently lifting,
> carrying, pushing or pulling objects weighing no more than 10 pounds; and
> which involves sitting, standing or walking up to six hours each in an eight-
> hour day; which does not require the use of machinery or require climbing
> ropes or scaffolding and which is considered routine, simple tasks; no
> confrontational situations; no intense interpersonal aspects; no high
> production quotas; no driving when using drugs; and limited interpersonal
> interactions with the public, coworkers, and supervisors (20 CFR §§
> 404.1545 and 416.945).

(*Id.*)

Based on the testimony of the VE, the ALJ concluded Showman could perform her past

relevant work as a dishwasher, stock worker, and produce clerk.  (Tr. 137-138.)  Accordingly, the

ALJ determined Showman "was not under a 'disability' as defined in the Social Security Act, at

any time through the date of the decision."  (Tr. 138.)

Showman filed a subsequent application for POD, DIB, and SSI in May 2014, alleging a

---

[7]     The Court notes the ALJ decision itself is not dated, but the list of exhibits in the
Transcript indicates the date of the prior ALJ decision is May 3, 2005.

18

disability onset date of January 1, 2012.[8]  (Tr. 265, 272, 311.)  On April 15, 2016, an ALJ held a

hearing, during which Showman, represented by counsel, and an impartial vocational expert

("VE") testified.  (Tr. 46-115.)  At the beginning of the hearing, the ALJ and Showman's counsel

discussed the prior 2005 decision as follows:

> ALJ:   Because that prior ALJ decision is very aged.
>
> Atty:   Old.
>
> ALJ:   Yes.
>
> Atty:   Yes.
>
> ALJ:   It's very old.
>
> Atty:   Lots of things have changed.
>
> ALJ:   Right.  It's been over ten years now.  So, I mean like there's new impairments, as well as worsening.
>
> Atty:   As well as worsening, and there's been age change.  Several age changes.  She would have been a younger individual back then for sure.
>
> ALJ:   Right.

(Tr. 53-54.)

On May 23, 2016, the ALJ issued a written decision finding Showman was not disabled.

(Tr. 21-45.)  Within this decision, the ALJ did not acknowledge the 2005 ALJ decision,

---

[8]      As noted *supra*, Showman later amended this onset date to August 1, 2013.  (Tr. 306.)  As her date last insured ("DLI") for POD and DIB benefits was June 30, 2013, Showman willingly relinquished her claim to all Title II benefits.  (Tr. 24, 26, 50, 306.)  Showman does not contest this amendment, and in her Brief, continues to allege a disability onset date of August 1, 2013.  (Doc. No. 14 at 2.)

*Drummond, Dennard*, or any Acquiescence Ruling.  (*See* Tr. 24-36.)  The ALJ also did not

provide any discussion eluding to the prior 2005 RFC or any principles of *res judicata*.  The ALJ

formulated the following RFC:

> After careful consideration of the entire record, I find that the claimant has
> the residual functional capacity to perform light work as defined in 20 CFR
> 404.1567(b) and 416.967(b) except the claimant is limited to occasional
> climbing of ramps and stairs; no climbing of ladders, ropes, and scaffolds;
> occasional balancing, stooping, kneeling, crouching, and crawling; frequent
> bilateral handling; frequent exposure to extreme cold and extreme heat; and
> no exposure to hazards.  The claimant is limited to routine workplace
> changes that can be explained.

(Tr. 28.)

Upon careful review, the Court finds the ALJ's failure to acknowledge or discuss the

prior ALJ decision constitutes error[9] which requires remand.  In the most recent ALJ decision,

the only mental restriction in the RFC is the "claimant is limited to routine workplace changes

that can be explained."  (Tr. 28.)  By contrast, the prior ALJ found multiple mental restrictions,

including "routine, simple tasks; no confrontational situations; no intense interpersonal aspects;

no high production quotas; no driving when using drugs; and limited interpersonal interactions

with the public, coworkers, and supervisors."  (Tr. 137.)

---

[9]     Both the Commissioner and Showman agree the physical limitations in the most
recent ALJ decision are more restrictive than the physical limits provided by the
ALJ in 2005.  (*See* Doc. No. 15 at 6, Doc. No. 16 at 3.)  Since the ALJ found
Showman to be more limited physically than the prior ALJ, any failure to mention
or analyze the 2005 ALJ decision with respect to Showman's physical
impairments constitutes harmless error.  *See Castrovinci v. Astrue,* 2012 WL
928736, *7 (N.D. Ohio Mar. 19, 2012); *Ford v. Berryhill*, 2017 WL 2531588, *3
(W.D. Ky. June 9, 2017)("even if the ALJ did not identify new and material
evidence of a change warranting departure from the prior RFC, the error was
harmless if the current RFC was more claimant-favorable than the prior one.").
Thus, the Court will limit its discussion to the mental restrictions contained in the
RFC.

The ALJ does not explain or acknowledge the significant divergence between the two RFCs.  There is no mention of *Drummond* and the language within the decision does not suggest the ALJ even considered the mental restrictions assessed by the prior ALJ.  It is impossible for this Court to discern whether the ALJ made any specific comparison to the prior ALJ decision when formulating the RFC.  Thus, the Court finds remand is appropriate to afford the ALJ the opportunity to properly evaluate the prior ALJ decision.  Courts within this Circuit have consistently and repeatedly remanded cases where an ALJ failed to acknowledge or discuss a prior disability determination.  *See Blevins v. Astrue*, 2012 WL 3149343, *6 (E.D. Ky. July 31, 2012)("The Court will not speculate as to the exact nature of the analysis conducted by the ALJ and any unstated findings, but rather will remand the action to provide the opportunity to specifically address his findings in light of the instructions of *Drummond* and Acquiescence Ruling 98-4(6)."); *Lay v. Comm'r of Soc. Sec.,* 2014 WL 4104644, *6 (S.D. Ohio Aug. 19, 2014)("By not analyzing the prior disability determination as required by *Drummond*, the Commissioner has failed to meet her burden of showing changed circumstances"); *Yerg v. Comm'r of Soc. Sec.*, 2016 WL 1161749, *7(N.D. Ohio Mar. 24, 2016)("I cannot simply assume that the ALJ's mere evaluation of the current circumstances and evidence actually made the required comparison"); *Miller v. Astrue*, 2012 WL 220234 (S.D. Ohio Jan. 25, 2012); *Rosebud v. Colvin*, 2015 WL 1481394 (E.D. Ky. Mar. 31, 2015); *Barker v. Astrue*, 2010 WL 2710520 (N.D. Ohio July 7, 2010); *Clark v. Comm'r of Soc. Sec.*, 2016 WL 2731020, *11 (W.D. Mich. May 11, 2016).

The Court acknowledges the Sixth Circuit recently issued *Earley v. Comm'r of Soc. Sec.*, 893 F.3d 929 (6th Cir. June 27, 2018).  Within *Earley*, it appears the Sixth Circuit has

21

limited the scope of *Drummond*, bringing its treatment of prior ALJ decisions closer to the approach used by other circuits.  *See Earley*, 893 F.3d at 934 ("This approach, as we see it, accords in the main with the approach taken by our sister circuits.").  In *Earley*, the Sixth Circuit clarified *res judicata* applies to subsequent applications for "the same period of time [] rejected by the first application."  *Id.* at 933.  However, the Sixth Circuit specifically rejected the Commissioner's suggestion the ALJ "should completely ignore earlier findings and applications," noting, "[f]resh review is not blind review."  *Id*. at. 934.  The Sixth Circuit also found "absent new and additional evidence, the first administrative law judge's findings are legitimate, albeit not binding, consideration in reviewing a second application."  *Id*. at 933.

In light of how recent *Earley* was decided, the Social Security Administration has understandably not issued an Acquiescence Ruling providing a policy on how the agency will apply the holding of *Earley*.  Because the Sixth Circuit specifically references the Fourth Circuit opinion *Albright v. Comm'r of Soc. Sec.* 174 F.3d 473 (4th Cir. 1999) when reaching its decision, this Court has reviewed the corresponding Acquiescence Ruling for guidance.  *See Earley*, 893 F.3d at 933-934.  Acquiescence Ruling 00-1(4), which applies to disability claims made within the Fourth Circuit, mandates ALJs "must consider [a prior ALJ's findings] as evidence and give it appropriate weight in light of all relevant facts and circumstances when adjudicating a subsequent disability claim involving an unadjudicated period."  AR 00-1(4) (S.S.A.), 2000 WL 43774, at *4 (2000).  While Acquiescence Ruling 00-1(4) and *Albright* are not binding on this Court, they further support the conclusion a complete failure to mention or evaluate a prior ALJ decision constitutes error.[10]

---

[10]     In any event, Acquiescence Ruling 98–4(6) continues to remain in effect for disability determinations taking place within the Sixth Circuit.  It also was in

The Commissioner cites several cases in support of her argument the failure to acknowledge a prior ALJ's findings constitutes harmless error.  (Doc. No. 15 at 6-7.)  However, each of these cases are distinguishable.  First, the Commissioner references *Castrovinci v. Comm'r of Soc. Sec.*, 2012 WL 928736 (N.D. Ohio March 19, 2012).  In *Castrovinci*, the court reasoned the ALJ's failure to mention *Drummond* in his decision was harmless error, as the RFC in his decision was more restrictive (i.e. more claimant-favorable) than the RFC from the prior decision.  2012 WL 928736 at *6-7.  The case at bar is distinguishable for several reasons.  First, as discussed *supra*, while the physical RFC is arguably more restrictive than the prior physical RFC, the mental RFC is clearly less restrictive.  Moreover, in *Castrovinci*, while the ALJ did not specifically reference *Drummond* in his decision, the ALJ acknowledged the findings of the prior ALJ.  *Id*. at *6.  Here, the ALJ does not elude to or reference any prior findings in her decision, thus making it impossible to determine if she had made any comparison when formulating the RFC.

The Commissioner next cites *Adcock v. Berryhill*, 2017 WL 6492614 (M.D. Tenn. Dec. 19, 2017).  However, unlike the instant case, the ALJ in *Adcock* specifically referenced the "*Dennard/Drummond* case law" prior to formulating the RFC.  *Id*. at *5.  Moreover, the Plaintiff did not raise "any errors in the ALJ's application of *Dennard* or *Drummond*" and "therefore waived any argument based on such application."  *Id.* at *5, *7.  The court concluded there was substantial evidence to support the ALJ's findings based upon other grounds.  *Id*. at *7-8.

Finally, the Commissioner repeatedly cites to *Williams v. Astrue*, 2010 WL 503140 (E.D. Tenn. Feb. 8, 2010).  In *Williams*, unlike the case at bar, the ALJ specifically

---

effect at the time of the ALJ's decision.

acknowledged *Drummond*, but the court found a "lack of express *Drummond* analysis." *Id.* at

*3. The court concluded the minimal *Drummond* analysis was harmless error, as the ALJ's

"*Drummond* reasoning therefore can be inferred from his overall discussion of plaintiff's

condition." *Id.* at *5. Here, however, it is impossible to infer the ALJ's "*Drummond* reasoning,"

as the ALJ does not even acknowledge the existence of a prior ALJ decision, nor does she

provide any discussion on the impact of *Drummond*.

The Commissioner contends "the changed circumstances since the prior decision are

obvious from the ALJ's discussion of the evidence." (Doc. No. 15 at 7, 8.) The Court disagrees.

As the ALJ does not reference any earlier findings or restrictions, or even elude to any

improvement since the 2005 decision, the Court cannot speculate as to what the ALJ perceived[11]

as the "changed circumstances" warranting such drastic change in Showman's mental RFC. *See*

*Clark*, 2016 WL 2731020 at *11 ("[T]he Court cannot trace the path of the ALJ's reasoning, such

as it is, regarding changed circumstances. The Commissioner's decision will therefore be

reversed and remanded for further consideration.").

The Commissioner also argues the ALJ provided a "thorough review of the record

related to the claimed period of disability." (Doc. No. 15 at 9.) However, this alone is not

enough to escape a *Drummond* error. *See Yerg*, 2016 WL 1161749, at *7 ("it is not enough that

new evidence be considered, but rather *Drummond* requires that 'a comparison between the

circumstances existing at the time of the prior decision and the circumstances at the time of the

---

[11]     The Court also finds it perplexing the ALJ, at the hearing, specifically stated
        Showman's condition had "worsened" since the prior ALJ decision. (Tr. 53.)
        Yet the ALJ actually provided a less restrictive mental RFC, indicating
        improvement. Thus, it is difficult for the Court to discern exactly how the ALJ
        viewed the prior restrictions in comparison to the updated medical evidence.

[new] review is necessary.'"); *Blevins*, 2012 WL 3149343 at *6 ("It is not enough that the ALJ

relies on new evidence that post-dates the earlier decision to arrive at his determination").

The Commissioner also emphasizes the fact there is an 11-year gap between the two

ALJ decisions.  (Doc. No. 15 at 5, 6.)  The Commissioner asserts "[u]nder facts of this case, with

an 11-year gap between decisions, the changed circumstances that permit the Commissioner to

'escape the principles of *res judicata*' under *Drummond* are plain."  (*Id.* at 6.)  However, the

Commissioner cites to no legal authority which supports her suggestion the passage of time

abolishes her duty to discuss the prior ALJ decision.  Indeed, the Court was able to locate at least

one instance where a court remanded a decision for failing to discuss a prior decision which pre-

dated the ALJ decision by nearly 13 years.  *See Lay*, 2014 WL 4104644 at *1-2.

Finally, the Commissioner argues the error is harmless in light of the vocational expert

testimony.  (Doc. No. 15 at 10.)  In cases where "the current RFC is less claimant-favorable but

the jobs relied on by the current ALJ in support of his/her finding of lack of disability do not

require the additional capacity, any error was harmless."  *Ford*, 2017 WL 2531588, at *3.  The

Commissioner concedes the VE "did not address a hypothetical question including the exact

mental limitations in the 2005 RFC."  (Doc. No. 15 at 10.)  Nonetheless, the Commissioner

argues the VE's testimony suggests Showman could perform most of the jobs identified, as they

require no contact or interaction with the public.  (Doc. No. 15 at 10, 11.)

However, the Commissioner's argument does not address the additional limitations set

forth in the 2005 RFC, namely – no confrontational situations, no intense interpersonal aspects,

and no high production quotas.  (Tr. 137.)  A review of the hearing testimony indicates none of

these additional limitations were discussed or presented to the VE during the hearing.  (Tr. 104-

112.)  Thus, although the VE testified the jobs identified would be available even if Showman

25

was limited to no interaction or contact with the public, the VE did not provide any testimony regarding any of the other limitations identified in the prior ALJ's RFC.  The error was therefore not harmless, as it is entirely possible these additional limitations may have changed the VE's testimony.  *See Barker*, 2010 WL 2710520 at *6.

In sum, the Court is mindful there may be sufficient evidence contained in the medical record which demonstrate an improvement in Showman's mental RFC and support the ALJ's findings.  However, it is not the role of this Court to speculate or conduct the required analysis of the prior ALJ decision.  *See Clark*, 2016 WL 2731020, at *11.

Accordingly, the Court finds remand[12] is necessary, thereby affording the ALJ an opportunity to properly consider the 2005 ALJ decision.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be VACATED and the case REMANDED for further consideration consistent with this decision.

 *s/Jonathan D. Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date: August 9, 2018

---

[12]    The Court notes Showman, within her Reply Brief, requests this Court order Defendant to obtain "all treatment records from 2005 to 2011."  (Doc. No. 16 at 2.)  Showman reasons since it is "Defendant's burden to establish changed circumstances," these records are necessary to determine if Showman's mental health condition had changed since the 2005 ALJ decision.  (*Id.*)  The Court recommends this request be declined.  The period before the ALJ was from August 1, 2013, the amended onset date, through the date of the decision.  The ALJ had the treatment records from this time period, thus affording her the opportunity to compare the period under review with the prior ALJ decision.

26

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).

27